

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AG COMMUNICATION SYSTEMS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 03 C 9035 ) |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 21, | ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM ORDER AND OPINION

Plaintiff AG Communication Systems Corporation ("AGCS") and Defendant International Brotherhood of Electrical Workers, Local Union No. 21 ("Union") are parties to a collective bargaining agreement. Following Lucent Technologies's acquisition of AGCS, the Union filed a grievance based on claimed violations of the CBA. Under the terms of the CBA, the parties submitted the grievance to arbitration, which was resolved in AGCS's favor. The Union has since filed a number of additional grievances and seeks to proceed to arbitration. AGCS now seeks a declatory judgment enforcing the first arbitration award and barring further arbitration on the grounds of *res judicata*. The parties have filed cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is granted.

### FACTUAL BACKGROUND

The parties do not dispute the facts surrounding this case. Much of this factual background is drawn from that set out in the arbitration ruling. (Award of Arbitrator Barbara K. Doering, dated Oct. 9, 2003, Plaintiff's Ex. A, hereinafter Arbitration Award.)

#### Corporate Background

Plaintiff AGCS is a manufacturer and supplier of telecommunications switching equipment. (Plaintiff's Local Rule 56.1(a) Statement, hereinafter Pl.'s 56.1(a), ¶ 6.) Its principal product, a

central telephone switch known as the GTD-5, is manufactured at its plant in Genoa, Illinois. (*Id.*) The Union (including its predecessors) has served as the collective bargaining representative of AGCS's Installers for more than 50 years. (*Id.* ¶ 7.) During that time, AGCS and the Union have entered into a series of collective bargaining agreements, the most recent of which covers the period from October 1, 2000 to September 30, 2004 (the "CBA"). (*Id.* ¶ 8.)

In a series of acquisitions and mergers during the 1980's and 1990's, Lucent Technologies ("Lucent") obtained an ownership share in AGCS. (*Id.* ¶ 9.) Pursuant to the terms of a joint venture agreement with other telecommunications firms, Lucent's ownership share was scheduled to increase from 49% to 100% full ownership by January 3, 2004. (*Id.* ¶ 10.) Lucent actually acquired full ownership of AGCS by February 3, 2003. (*Id.* ¶ 9.)

## Collective Bargaining Agreement

At the time AGCS and the Union negotiated their last collective bargaining agreement in 2000, Lucent owned 90% of AGCS. (*Id.* ¶ 11.) During these contract negotiations, the parties were aware that Lucent would acquire full ownership of AGCS by early 2004. (*Id.* ¶ 12.) In response to a Union query regarding the possible effect of Lucent's acquisition of sole ownership, an AGCS official admitted the possibility that "Lucent would suck us in," i.e., assume control over AGCS's labor operations. (*Id.* ¶ 12; Arbitration Ruling, at 4.) At the request of AGCS representatives, the parties agreed to extend the term of the CBA to four years, as opposed to the usual three, to avoid having to renegotiate the contract prior to Lucent's acquisition of 100% control of AGCS. (Arbitration Ruling, at 4.)

The 2000 CBA contained a new provision called "Successor/Cessation of Bargaining Unit Operations," which established certain notice and benefit obligations on the part of AGCS that would be triggered by a cessation of operations. (Pl.'s 56.1(a) ¶ 13.) Specifically, this provision stated:

2

> In the event the Company [AGCS] decides to cease Bargaining Unit operations thereby terminating the seniority of the Employees, it shall give notice of its decision to the Union and to regular full time Employees at work. Accordingly, the Company agrees to give sixty (60) calendar days notice of its decision to cease Bargaining Unit operations to affected Employees regularly at work.

(Collective Bargaining Agreement Effective Oct. 1, 2000 through Sept. 30, 2004, Plaintiff's Ex. B, hereinafter CBA, ¶ 20.) The provision went on to set out a variety of benefits, including a pay allowance, health benefit, and education training, to be offered to qualified employees upon cessation of operations. (*Id.*)

The CBA provision contained an exception to the notice and benefits obligations upon "cessation of business" for any changes resulting from corporation reorganization and restructuring:

> The terms "cessation of business" and "cease Bargaining Unit operations" mean the termination and discontinuance of all Bargaining Unit operations covered by this Agreement without any then existing plan to conduct new Bargaining Unit operations. Such terms do not refer to the termination and discontinuance of only part of the Company's Bargaining Unit operations . . . nor to any changes that result from corporate reorganizations and restructuring or from the sale or other transfer of some or all of the Bargaining Unit operations.

(*Id.*) The dispute underlying this current action arises out of the meaning of this CBA provision and the scope of the carve-out for changes resulting from corporation reorganizations and restructuring.

### Union's Initial Grievance

Lucent acquired the remaining shares of AGCS on February 3, 2003, approximately eleven months earlier than expected under the joint venture agreement.[1] (Pl.'s 56.1(a) ¶ 16.) Approximately four months later, Union officials became aware that certain Lucent technicians were being trained on AGCS product installation work – work reserved under the CBA for Union employees. (*Id.* ¶ 17.) On June 10, 2003, Mike DeWitt, the Union's Business Representative, contacted Patrick Murphy, AGCS's Labor Relations Manager, by email, inquiring into the numbers

---

[1] The record does not indicate why Lucent acquired 100% ownership of AGCS ahead of schedule.

of workers being trained and expressing his concerns about AGCS's intentions. (*Id.* ¶ 17.) In an email dated June 19, 2003, Murphy replied that Lucent's intent was to "cross-train" the workforce, i.e., train Lucent employees on AGCS work and AGCS employees on Lucent work. (*Id.* ¶ 18.)

On July 2, 2003, DeWitt filed a grievance (Grievance #03-17) concerning "the fact that the Company is training sixteen Lucent craft employees to test and/or install on GTD-5s which is our bargaining unit work." (*Id.* ¶ 19.) On July 17, 2003, the Union demanded arbitration of the pending grievance. (*Id.* ¶ 20.) That same day, DeWitt received a letter from William Schechter, the Workplace Relations Vice President for Lucent, advising that since its acquisition of AGCS in February 2003, Lucent had been "reviewing AGCS customer commitments, functional processes and organizational structures in order to determine how to best maximize the resources of both AGCS Installation Services and Lucent Worldwide Services (LWS) Deployment Services." (*Id;* Letter from William Schechter to Michael DeWitt, dated July 17, 2003, Plaintiff's Ex. F, at 1.) The letter announced that "[e]ffective August 1, 2003, Lucent will merge AGCS Installation Services into LWS Deployment Services such that the two operations will be fully functionally integrated and AGCS will no longer employ personnel who perform installation work." (*Id.*) As a result, Schechter advised DeWitt that the AGCS and Lucent installation workforces "will be functionally and operationally merged to the point that AGCS installers will have lost their identity as a separate group, [and] an accretion will have occurred such that AGCS installers will become and should remain part of [Lucent's] CWA-represented installation bargaining unit."[2] (Pl.'s 56.1(a) ¶ 21; Plaintiff's Ex. F, at 1.) The following day, in a letter dated July 18, 2003, Lucent's Deployment Services Vice President Barbara Landmann announced the company's "decision to integrate AGCS Installation Services into Lucent Worldwide Services (LWS) Deployment Services effective

---

[2] At the time, Lucent maintained a workforce of approximately 2500 installers represented by the Communications Workers of America under a nationwide collective bargaining agreement. (Plaintiff's Ex. F, at 1.)

4

August 1, 2003."³ (Pl.'s 56.1(a) ¶ 22; Plaintiff's Ex. G.)

In a letter dated July 21, 2003, Dewitt stated his belief that Lucent's decision to merge the installation groups "demonstrate[s] a clear intent to abort the Collective Bargaining Agreement, including a complete disregard of the Union's status as the exclusive bargaining representative for all Installation Technicians." (Letter from Michael DeWitt to Patrick Murphy, dated July 21, 2003, Plaintiff's Ex. H, at 2.) DeWitt demanded that the Union's grievance proceed to arbitration prior to the August 1, 2003 merger date. (Id.) Regarding the need for immediate arbitration, he wrote:

> It is imperative that we resolve the fundamental question of whether management can unilaterally discontinue all the provisions of our Bargaining Agreement, including the recognition of Local 21, without mutual agreement by Local 21. This determination must be made before the Company actually merges the Bargaining Unit into the CWA LWS Deployment Services. We cannot be in a situation in which the Union's and the Bargaining Unit members' rights under the contract are sustained months after the elimination of the Bargaining Unit. There is no way in which the Union and its members can receive an effective remedy should an arbitrator determine that the Company had no right to abrogate our bargaining agreement after the merger has taken place.

(Id.) DeWitt concluded by noting that the need for an arbitration hearing on short notice was necessitated by "the Company's failure and resolve not to provide advance information to the Union." (Id.) If an arbitration could not be held by that date, "then the Union submits that the Company should stay immediate actions to merge the AGCS Bargaining Unit into the LWS and the CWA contract until such time that final arbitration may be held." (Id.)

### Union's Complaint for Injunctive Relief

On July 25, 2003, the Union filed an action before this court seeking to enjoin the August 1 transfer of employees from AGCS to Lucent until the Union's grievance had been resolved through arbitration. In its complaint, the Union urged the court to issue "a temporary and then preliminary and then permanent injunction" requiring Lucent and AGCS to "maintain and honor all

---

³ The July 18 letter does not identify its recipients, but it appears to be addressed to the AGCS Installation workers themselves.

5

terms of the bargaining agreement between Local 21 and AGCS until such time as arbitration of the subject Grievance has been held and decided by an impartial arbitrator or otherwise resolved by agreement of the parties." (Complaint, Case No. 03 C 5190, Plaintiff's Ex. J, ¶ 12.) After conducting an oral hearing on the motion, this court granted the Union's Motion for Preliminary Injunction in Aid of Arbitration on July 31, 2003. *Local 21 International Brotherhood of Electrical Workers v. AG Communication Systems, et al*, No. 03 C 5190 (N.D. Ill. July 31, 2003) (order granting preliminary injunction). The court enjoined the transfer for 14 days, pending an "immediate expedited arbitration." (Pl.'s 56.1(a) ¶ 41.)

On August 18, 2003, the Union agreed to dismiss its suit pursuant to a settlement with AGCS and Lucent. (*Id.* ¶ 42.) Under the settlement, the parties agreed to conduct a three-day arbitration hearing before Arbitrator Barbara Doering. (*Id.*) The three-day hearing was scheduled for September 10, 15, and 19, 2003, with provisions for pre-hearing and post-hearing briefs from the parties, and a final award by October 9, 2003. (*Id.* ¶ 45.)

## Arbitration Hearing

At the arbitration hearing, the Union argued that AGCS had no right to unilaterally disavow the CBA during its term. The Union maintained that the transfer of workers violated the CBA. In its pre-hearing statement to the arbitrator, it highlighted certain key provisions of the CBA, including: (1) the Article I notice provisions requiring either party to give sixty days' notice before seeking to renegotiate the CBA terms; (2) the Article 7 provision recognizing the Union as the exclusive bargaining representative for all of the company's "telephone equipment installers"; and (3) the Article 13 and 14 provisions regarding continuous service and employee seniority. (Union's Pre-hearing Statement, Plaintiff's Ex. N, at 10-11.)

The Union further insisted that AGCS could not avoid its obligations under the CBA by

6

claiming that its owner, Lucent, was responsible for the complained-of actions.[4] (Arbitration Ruling, at 9.) It maintained that the removal of work and workers from AGCS to Lucent violated the CBA because Lucent was not acting as an independent entity, but rather as the sole owner of AGCS, and that the two entities were a single employer with respect to the bargaining unit. (*Id.* at 9-10.)

The main thrust of the Union's argument during the arbitration focused on Article 20, regarding the "Cessation of Bargaining Unit Operations." The Union asserted that the fact that AGCS did not follow that Article's requirements – including 60 days' notice and a variety of severance payments – is evidence that neither AGCS nor Lucent believed that their decision to transfer the employees on August 1, 2003 constituted a cessation of bargaining unit operations. (Arbitration Ruling, at 10.) This reinforced its claim that Lucent's elimination of the bargaining unit occurred in its role as Employer – i.e. sole owner of AGCS stock – and "that the Employer party cannot avoid its contractual obligation by claim that AGCS's owner, Lucent Technologies, not AGCS, was responsible for the action subject to the Union's Complaint." (Union's Post-hearing Brief, Plaintiff's Ex. P, at 5.) In light of this, the Union also noted the inconsistency of AGCS/Lucent's treatment of the Union, "on the one hand, contending that the bargaining unit no longer exists and therefore seniority as defined by the collective bargaining agreement has been terminated, while not following the notice and 'business cessation allowance' provisions in Article 20." (*Id.* at 14.)

The Union rejected ACGS's contention that the provision of Article 20 regarding sale or transfer of the bargaining unit operations applied here. During arbitration, the Union insisted that this provision, which states that employees are not entitled to any termination benefit in the event of a sale or transfer of bargaining unit operations, must be read in the context of the whole Article and that the sale or transfer referred to had to be one that did not involve cessation of Bargaining

---

[4] AGCS did not argue that Lucent had stepped into the shoes of AGCS with respect to its obligations under the CBA. Lucent itself was not a party to the arbitration.

Unit operations nor the termination of seniority. Specifically, the Union contended that "although there is a sale or transfer, the 'Bargaining Unit operations' must continue under the terms of the collective bargaining agreement. If it were otherwise, then the notice and benefit provisions required if the Bargaining Unit 'ceased' as opposed to having been 'transferred' would be applicable." (Union's Post-hearing Memorandum, at 15.)

For its part, AGCS denied having violated or abrogated the CBA. As an initial matter, AGCS observed that the CBA itself identifies only AGCS as the "Company" bound by it. Pointing to Article 4 of the CBA, which strictly limits the scope of an arbitrator's authority to "interpretation or application of this Agreement," and "expressly" limits the arbitrator to "a decision upon the question(s) of alleged violation of a specific provision of this Agreement rather than an indirect or implied intent thereof," AGCS argued that nothing in the CBA gives the arbitrator the right to expand that definition to include Lucent or any other entity. (Arbitration Ruling, at 13.)

AGCS further denied that it represented, along with Lucent, a "single employer." (*Id.* at 14.) AGCS noted that although Lucent acquired majority ownership of AGCS in the mid-1990s, there was no evidence of any co-mingling of employees or supervision between Lucent and AGCS prior to August 1, 2003. (*Id.*) Moreover, AGCS argued, the Union's attempt to rely on NLRB case law to enforce single employer or alter ego status is inappropriate, even if such grounds exist, because such extra-contractual theories would be outside the limited authority granted to arbitrators under Article 4 of the CBA.[5] (*Id.* at 14-15.)

On October 9, 2003, Arbitrator Doering issued her final award in favor of AGCS. After discussing the parties' relative positions regarding the various terms of the CBA (especially regarding Article 20's provisions on cessation of bargaining unit operations), she concluded:

---

[5] Article 4 provides that the arbitration board "shall have no power to add to or subtract from or modify any provisions of this Agreement, and its authority shall be expressly limited to a decision upon the question(s) of alleged violation of a specific provision of this Agreement rather than indirect or implied intent thereof." (CBA ¶ 4.)

8

> [The arbitrator] is not persuaded that the Union has proven that Lucent is in a single employer status, and/or at least not persuaded that she has jurisdiction to make that finding. While the term of the contract in Article 1 is explicit, Article 20, in its exceptions to cessation, shows that in addition to sale and successorship, other events that would interfere with the term of the contract were also contemplated. The language does not say one way or the other whether bargaining unit operations which should not be deemed to have ceased by virtue of the exceptions would continue *under the terms of this contract*. By including corporate restructuring, reorganization, or other transfer in the category with sale or successorship for which the 3rd party is to be made aware of the contract but is not necessarily bound by all of its items, the arbitrator is of the opinion that these exceptions similarly do not require that the terms of the contract necessarily carry over along with bargaining unit operations. Inasmuch as the non-termination of seniority is a factor in falling under the exceptions, even though the arbitrator has some difficulty with the concept, the arbitrator accepts the Company's contention that this contract continues to exist even though the people and work have been removed to Lucent.

(Arbitration Ruling, at 21.)

## Subsequent Grievances

Five days after the arbitration award, on October 14, 2003, the Union filed a second grievance, Grievance # 03-29. In it, the Union alleged that AGCS "has violated the collective bargaining agreement and specifically, but not limited to Article 20, by failing and refusing to provide the Union with sixty calendar days notice of the Company's decision to Cease Bargaining Unit Operations as of August 1, 2003 and to provide the members of the bargaining unit with the 'Business Cessation Benefits' and 'Business Cessation Allowance' as set forth in Article 20." (Email from Mike DeWitt to Patrick Murphy et al., dated Oct. 14, 2003, Plaintiff's Ex. R.) The Union further demanded that AGCS "[p]rovide all bargaining unit members including those with recall rights as of August 1, 2003, with A. pay allowance, B. Health Benefits, and C. Educational Retraining Assistance Benefits (ERAB) that are listed under 'Business Cessation Allowance' in Article 20." (*Id.*) The Union requested that the dispute be submitted to binding arbitration pursuant to the terms of the CBA.

On October 19, 2003, the Union filed yet another grievance (Grievance # 03-30). In this one, the Union asserted that although Arbitrator Doering ruled that the CBA does not cover the

9

transfers for members of the bargaining unit from AGCS to Lucent and that the Arbitrator has no authority to require Lucent to abide by the terms of the CBA, she concluded that the CBA between AGCS and Local 21 remains in effect. (Email from Mike DeWitt to Patrick Murphy et al., dated Oct. 19, 2003, Plaintiff's Ex. S.) The Union expressed its disagreement with the ruling, but maintained that given the ruling, "it logically figures that AGCS is in violation of the Contract with Local 21 in that the members of our bargaining unit are not receiving the hours, wages and working conditions provided by the Contract and AGCS is not complying with the Union dues check off provisions of the Agreement." (*Id.*) The Union claimed, further, that AGCS remains in "continuous violation of Local 21's Recognition rights under Article 7" of the CBA by:

> (A) unilaterally changing the hours, wages, and working conditions for members of the bargaining unit represented by the union; (B) failing to negotiate over the decision to transfer members of the bargaining unit from AGCS to Lucent Technologies; and (C) failing to negotiate over the effects upon the bargaining unit of the decision to transfer members of the bargaining unit from AGCS to Lucent Technologies.

(*Id.*) The Union again requested that the grievance be submitted to binding arbitration.

**Procedural History**

On December 16, 2003, AGCS brought suit in this court seeking enforcement of the October 2003 arbitration award through issuance of a declaratory judgment. AGCS seeks a determination that the Union's two recent grievances are simply attempts to re-arbitrate the issue resolved in the first arbitration and that, as such, they are barred by the doctrine of *res judicata* and should not be submitted to arbitration. The Union has submitted its own cross-motion for summary judgment, arguing that the issue of whether the additional grievances are barred by *res judicata* should be determined by an arbitrator, not by a court. For the reasons explained below, Defendant's motion is granted, and Plaintiff's complaint is dismissed.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Cases in which "the parties agree that there are no genuine issues of material fact in dispute and that the contested issues are purely legal ones, are especially appropriate for summary judgment." *Amax Coal Co. v. United Mine Workers*, 92 F.3d 571, 575 (7th Cir. 1996).

### II. *Res Judicata*

The presence of an arbitration clause in a collective bargaining agreement indicates that the parties have chosen to have disputes regarding the construction of the agreement resolved by an arbitrator. *W.R. Grace and Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 764 (1983). "It is well-established that the determination as to '[w]hether a particular bargaining agreement creates a duty to arbitrate is a matter for judicial determination.'" *Independent Lift Truck Builders Union v. NACCO Materials Handling Group, Inc.*, 202 F.3d 965, 968 (7th Cir. 2000), *quoting Local Union 1393 Int'l Bhd. of Elec. Workers v. Utilities Dist. of W. Indiana Rural Elec. Membership Coop.*, 167 F.3d 1181, 1183 (7th Cir. 1999). In making this determination, courts resolve all doubts in favor of arbitrability. *Litton Financial Printing Division, Inc. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 209 (1991). This presumption of arbitrability is consistent with the longstanding federal policy favoring arbitration of labor disputes. *Chicago Dist. Council of Carpenters Pension Fund v. K & I Construction, Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001).

Plaintiff AGCS argues that the court should enjoin further arbitration of the Union's grievances arising out Lucent's decision to transfer the AGCS Installers to Lucent. In her October 2003 Arbitration Award, Arbitrator Doering ruled that the CBA no longer covers those workers transferred to Lucent. Arbitrator Doering then denied the Union's grievance. AGCS contends that the arbitrator's earlier award disposes of the issues in the Union's two new grievances.

Regardless of whether or not the Union's currently pending grievances differ in any real way from those previously ruled upon by Arbitrator Doering, the court concludes those grievances must be submitted to arbitration. It is "well-established that 'the preclusive effect of the first arbitrator's decision is an issue for a later arbitrator to consider.'" *NACCO*, 202 F.3d at 968, *quoting Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R. Co.*, 24 F.3d 937, 940 (7th Cir. 1994); *see also Consolidation Coal Co. v. United Mine Workers*, 213 F.3d 404, 407 (7th Cir. 2000) ("[T]he question of the preclusive force of the first arbitration is, like any other defense, itself an issue for a subsequent arbitrator to decide."); *Production and Maintenance Employees' Local 504, Laborers' Int'l Union v. Roadmaster Corp.*, 916 F.2d 1161, 1162 (7th Cir. 1990) ("Whether more than one arbitrator can take a crack at interpreting the contract is itself a question of contractual interpretation."). The CBA at issue here expressly states that all grievances "relating to the interpretation or application of specific provisions of this Agreement . . . shall be submitted at the request of the parties to an Arbitration Board . . . ." (CBA ¶ 4.) By this clause, the parties agreed to have all disputes concerning the construction and interpretation of the CBA submitted to arbitration. *NACCO*, 202 F.3d at 968, *citing W.R. Grace*, 461 U.S. at 764. Under such circumstances, "the union is entitled to an order compelling arbitration even if the doctrine of claim preclusion in federal law might forbid successive litigation had the first arbitrator been a judge." *Roadmaster Corp.*, 916 F.2d at 1163; *NACCO*, 202 F.3d at 968.

The Seventh Circuit has previously denied attempts to avoid arbitration on the basis that

the issue raised in the grievance has been decided in a prior arbitration. In *NACCO*, for example, a union filed suit seeking a court order requiring an employer to arbitrate a dispute over the employer's right to make unilateral changes to retiree medical benefits. *NACCO*, 202 F.3d at 966. The employer had refused to arbitrate the grievance, asserting that the grievance and suit was precluded by an earlier arbitration on the same issue and the CBA's finality clause. *Id.* at 967. In ordering the parties to proceed to arbitration, the Seventh Circuit did not address the merits of the employer's preclusion argument, but instead held that "the preclusive effect of an arbitrator's decision is an issue for a subsequent arbitrator to decide." *Id.* at 968. AGCS's attempts to distinguish *NACCO* factually from the current case are of no avail. Although *NACCO* involved different circumstances – notably, the fact that the second arbitration occurred five years prior to the grievance at issue and involved a predecessor of the defendant employer – the court did not base its broader conclusion on the specific facts of the case. Rather, the court broadly held that issues of preclusion are properly determined by an arbitrator, not a court.

Other courts have similarly concluded that the doctrine of *res judicata* in the arbitration context is an issue for the arbitrator. *See Little Six Corp. v. United Mine Workers*, 701 F.2d 26, 29 (4th Cir. 1983) ("[T]he question of the preclusive effect of [a prior] arbitration award is itself arbitrable."); *New Orleans Steamship Ass'n v. General Longshore Workers*, 626 F.2d 455, 465 (5th Cir. 1980) ("Whether the [arbitration] award can be given an effect akin to res judicata or stare decisis with regard to future disputes that may arise between the parties, neither the district court nor this court should decide. If the parties do not agree, that issue itself is a proper subject for arbitration."), *aff'd sub nom. Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702 (1982); *Local 103, Int'l Union of Elec., Radio and Mach. Workers v. RCA Corp.*, 516 F.2d 1336, 1339 (3d Cir. 1975) ("It is the function of the arbitrator, not the court, to decide whether the 'same question or issue' had been the subject of [previous] arbitration . . . ."); *Teamsters Local*

*623 v. United Parcel Service, Inc.*, 786 F. Supp. 509, 513 (E.D. Pa. 1992) ("Allowing the issue of *res judicata* . . . to remain with the arbitrator, will promote the strong congressional policy in favor of arbitration of grievances under a collective bargaining agreement."); *Teamsters, Chauffeurs, Warehousemen and Helpers Local No. 490 v. Lucky Stores, Inc.*, No. 94 C 2177, 1994 WL 721432, *3 (N.D. Cal. Dec. 28, 1994) ("The preclusive effect of a prior labor arbitrator's award generally is a matter for a subsequent arbitrator to determine . . .").

Nevertheless, AGCS insists that the Seventh Circuit has expressly recognized that "in some instances, judicial intervention may further national arbitration policy." *Local Union No. 4343 of United Mine Workers v. Old Ben Coal Co.*, 762 F. Supp. 251, 254 (S.D. Ind. 1991); *United Elec., Radio & Machine Workers v. Honeywell, Inc.*, 522 F.2d 1221, 1225 (7th Cir. 1975) (permitting courts to intervene in some circumstances "might, in fact, further national arbitration policy"). It maintains that, in certain situations, the court has left open the possibility of prospectively enforcing arbitration awards in cases where the facts of the pending grievance are "substantially identical" to those previously arbitrated. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judge, at 1-2.)

AGCS is correct in noting that the Seventh Circuit has not foreclosed the prospective enforcement of arbitration awards. The court has allowed that there may be situations in which it is appropriate for courts to prospectively enforce arbitration awards where a party "deliberately persists in conduct in clear violation of a prior arbitration award," leaving the other party to the CBA "without an appropriate remedy." *Honeywell, Inc.*, 522 F.2d at 1228; *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1296 (7th Cir. 1989).

The cases cited by AGCS, however, involve a different issue than the one before this court: namely, the enforcement of a prior arbitration award prospectively in the event of similar future violations. In *Honeywell*, for example, arbitrators had on four occasions found that Honeywell had

14

violated the terms of the CBA by assigning bargaining unit work to supervisors, foremen, and other non-covered employees. *Honeywell, Inc.*, 522 F.2d at 1223-24. After Honeywell again engaged in such behavior, the union brought an action for declaratory judgment and injunctive relief prohibiting the company from assigning work to non-union employees. In its suit, the union argued that the company's conduct constituted "massive, pervasive, willful and deliberate nullification of the recognition and arbitration clauses" of the CBA, and that the union should not be forced to re-arbitrate each subsequent violation. *Id.* at 1224. Without foreclosing "the possibility that there might exist particularly egregious circumstances which, if alleged, might state a cause of action for relief from a contractual duty to arbitrate," the court even there refused to apply the past awards prospectively and relieve the union of its duty to arbitrate. *Id.* at 1225. Specifically, the court observed that: (1) the union had not previously sought declaratory and injunctive relief from the arbitrator, and that it cannot argue that such relief is unavailable through arbitration; and (2) the factual basis of the prior awards were not "so nearly identical to the facts of the pending grievances that the Company's conduct constitutes wilful and persistent disregard of the arbitration awards." *Id.* at 1227.

Similarly, in *Inland Steel*, arbitrators had ruled on two occasions that the employer's early dismissal of workers violated the CBA. *Inland Steel Coal Co.*, 876 F.2d at 1290-91. When the employer again dismissed certain workers early, the union brought suit in an attempt to apply the prior arbitration award to future violations by the employer. In considering whether the prior arbitration awards should be prospectively enforced against this subsequent violations, the court stated that it would focus on the particular facts of each case, "rather than articulating a broad, general standard to apply in determining whether to enforce an arbitration award prospectively." *Id.* at 1295. The court discussed a number of factors to be considered in deciding whether the prospective application of an arbitration award is appropriate. Notably, the court focused on

15

whether (1) the earlier arbitration awards contained language directing that they apply to "like violations" and (2) the facts of prior arbitration awards were "substantially identical" to those in subsequent grievances, such that the conduct "constitutes wilful and persistent disregard of the arbitration awards."[6] *Id.* at 1295, quoting *Honeywell, Inc.*, 522 F.2d at 1227. The court concluded, however, that the plaintiff union was unable to show that "the awards were intended to apply prospectively and that the companies' 'conduct constitutes wilful and persistent disregard for the arbitration awards.'"[7] *Inland Steel Coal Co.*, 876 F.2d at 1297, quoting *Honeywell, Inc.*, 522 F.2d at 1227.

In contrast, AGCS is not seeking to prospectively apply a past arbitration award to enjoin continuing violations. Rather, AGCS attempts to apply the *res judicata* doctrine to prevent the re-arbitration of issues it believes have been previously arbitrated. Despite the fact that in situations where preclusion is the lone issue, courts have concluded that the issue is one for the arbitrator and not the courts, AGCS nevertheless urges the court to extend the prospective application

---

[6] Other Circuits have enacted similar tests, generally focusing on (1) whether the arbitrator intended the initial award to apply prospectively and (2) whether the subsequent grievance was substantially the same as the initial grievance. *See, e.g., United Paperworkers Int'l Union Local 1206 v. Georgia Pacific Corp.*, 798 F.2d 172, 173 (6th Cir. 1986) ("Where there are intervening changes in facts which are arguably significant and there is no language in the prior award directing prospective application, the issue of whether the arbitrator's award should be prospectively applied is appropriately one for the arbitrator to decide."); *Oil, Chem. & Atomic Workers Int'l Union v. Ethyl Corp.*, 644 F.2d 1044, 1055 (5th Cir. 1981) (prior awards prohibiting "like" violations applied prospectively "when there is no difference between the current facts and those giving rise to the prior arbitration award which, when analyzed in light of the mandates of the collective bargaining agreement, would justify an arbitrator's reaching a different conclusion in each of the two cases"); *Boston Shipping Assoc., Inc. v. Int'l Longshoremen's Assoc.*, 659 F.2d 1, 4-5 (1st Cir. 1981) (applying prospectively an award where there was no "material change" in circumstances); *see also Inland Steel Coal Co.*, 876 F.2d at 1293-1294 (discussing treatment of issue in other Circuits).

[7] Indeed, although the Seventh Circuit stated in *Inland Steel* that the court its decision "do[es] not foreclose the possibility that a party could allege sufficient facts to avoid the arbitral process in a different situation," *Inland Steel Coal Co.*, 876 F.2d at 1288, AGCS has not pointed to any cases in which the Seventh Circuit has prospectively applied an arbitration award as a bar to future grievances.

16

analysis to cases involving the doctrine of *res judicata*. It insists that this is necessary because, in the absence of such judicial enforcement, parties will repeatedly bring grievances and re-arbitrate issues until they achieve a favorable result – thus threatening the interest in finality and the efficacy of the arbitration process. The Seventh Circuit expressly rejected this argument in *Inland Steel*, stating: "We do not believe it is necessary for us to protect the arbitral process from repetitive grievances. In submitting the grievance to an arbitrator, the union is free to argue that it has already submitted this same dispute to arbitration." *Inland Steel Coal Co.*, 876 F.2d at 1296, citing *RCA Corp.*, 516 F.2d at 1341. Thus, during the subsequent arbitration, "the arbitrator can consider the fact that the dispute was previously arbitrated and decide for himself if he believes that declaratory or injunctive relief is warranted by the facts of the case." *Inland Steel Coal Co.*, 876 F.2d at 1296. The lone situation in which the court anticipated such a prospective application would be appropriate is one where a party "deliberately persists" in violating a prior award, leaving the other party "without an appropriate remedy." *Id.*, quoting *Honeywell Corp.*, 522 F.2d at 1228.

AGCS faces no such intransigence in this case. Although the Union's persistence in pursuing its grievances may run headlong into the doctrine of *res judicata*, the court does not see how AGCS will be prejudiced by having this issue decided by the arbitrator, rather than the courts.[8] This case differs markedly from the hypothetical situation discussed in *Honeywell* and *Inland Steel*, where an employer continues to violate the CBA in the face of adverse arbitration awards so that the union had no recourse but the courts. *Inland Steel Coal Co.*, 876 F.2d at 1297; *Honeywell, Inc.*, 522 F.2d at 1227.

Furthermore, courts have frequently noted that "notions of *res judicata* are less suited to

---

[8] Indeed, if the *res judicata* issue is as clear cut as AGCS maintains, the arbitrator should have little trouble disposing of the Union's grievances quickly. If, on the other hand, after submitting the issue to arbitration, AGCS believes the arbitrator has misapplied the *res judicata* doctrine, then the company may appeal the arbitrator's award to the courts, albeit within the strict limits of judicial review of arbitration awards discussed below.

17

the informal process of industrial arbitration than to the litigation process." *Honeywell, Inc.*, 522 F.2d at 1228; *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1509 (7th Cir. 1991) (The principle of *res judicata* is "applied less rigorously on average in arbitration than in adjudication . . . .") (internal quotations omitted). On this point, the Seventh Circuit wrote:

> Arbitrators frequently interpret the scope and binding effect of earlier arbitral decisions. Parties to a collective bargaining agreement may elect to have rigorous rules of preclusion or lax ones. Courts enforce rules of merger and bar, precluding a second litigation to consider claims that could have been, but were not, resolved in the first. Contracting parties and their arbitrators do not always select such strict rules. Parties may require remands to the original arbitrators to consider new issues or forbid remands and allow second proceedings. Because these are legitimate options, and the choice is influenced by implied as well as express terms, the union is entitled to an order compelling arbitration even if the doctrine of claim preclusion in federal law might forbid successive litigation had the first arbitrator been a judge.

*Roadmaster Corp.*, 916 F.2d at 1162-63 (internal citations omitted). Thus, by including an arbitration clause in the CBA, AGCS and the Union "agreed to have their disputes concerning construction of the CBA, *including its finality provision*, resolved by an arbitrator rather than the courts."[9] *NACCO*, 202 F.3d at 968, *citing W.R. Grace*, 461 U.S. at 764 (emphasis added).

Ever since the *Steelworkers Trilogy* decisions in 1960, national policy has favored the orderly resolution of labor disputes and grievances through arbitration where the parties have agreed contractually to be bound by an arbitrator's decision. *Amoco Oil Co. v. Oil, Chem. and Atomic Workers Int'l Union*, 548 F.2d 1288, 1293 (7th Cir. 1977), *citing United Steelworkers v.*

---

[9] For example, the general rule of *res judicata* is that a final judgment on the merits in a court of competent jurisdiction bars the same parties from relitigating the claim raised and decided in the former adjudication. As a corollary to this rule, the doctrine also bars litigation of matters that should or could have been raised in the prior proceeding. *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1364 (7th Cir. 1988). This corollary may be including the CBA's finality provision, but it need not. In any event, the question is one of contractual interpretation for the arbitrator. *W.R. Grace*, 461 U.S. at 764 ("When the parties include an arbitration clause in their collective bargaining agreement, they choose to have disputes regarding constructions of the contract resolved by an arbitrator.").

*American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). In light of this policy, the role of courts is "severely circumscribe[d]" in the context of arbitration. *Id.* Indeed, when faced with a challenge to an arbitration award, courts are precluded from examining the merits of the award, and must confine their inquiry to the "narrow questions of whether the award 'draws its essence from the collective bargaining agreement' and whether 'the arbitrator's words manifest an infidelity to this obligation.'" *Amoco Oil Co.*, 548 F.2d at 1293-94, *quoting Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 597.

Courts have long recognized that judicial involvement threatens to interfere with the benefits of arbitration. As the Seventh Circuit has noted:

> [A]rbitration clauses are agreements to move cases out of court, to simplify dispute resolution, making it quick and cheap. . . . Arbitration will not work if legal contests are its bookends: a suit to compel or prevent arbitration, the arbitration itself, and a suit to enforce or set aside the ward. Arbitration then becomes more costly than litigation, for if the parties had elected to litigate their disputes they would have had to visit court only once.

*Roadmaster Corp.*, 916 F.2d at 1163. Moreover, the First Circuit has remarked that "[t]he processing of even frivolous grievances may have a therapeutic effect in the industrial environment of which we who are unfamiliar with that setting may be only dimly aware." *Boston Shipping Assoc., Inc.*, 659 F.2d at 4, *citing Steelworkers v. American Mfg. Co.*, 363 U.S. at 568.

In light of this strong policy favoring arbitration over litigation, the court declines to intervene in the arbitration process. Although the Seventh Circuit has recognized certain egregious circumstances in which it would intervene to prevent a party from flaunting an arbitration award, the Union's grievances do not resemble that limited (and, to date, hypothetical) exception. In the absence of any compelling need to intervene to protect the integrity of the arbitration process, the court will leave it to the arbitrator to decide the merits of the Union's grievances, as well as any defenses raised by AGCS.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment (Doc. No. 5-1) is granted. Plaintiff's motion for summary judgment is denied. (Doc. No. 6-1). The parties are directed to proceed to arbitration of the pending grievances.

ENTER:

Dated: March 28, 2005

REBECCA R. PALLMEYER
United States District Judge